UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  AMD02CV3858 |
| | ) | |
| v. | ) | Hon.  Andre M. Davis |
| | ) | |
| ABB, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
MOTION TO ENTER CONSENT DECREES**

Plaintiff, the United States of America, respectfully submits this

Memorandum in Support of its Motion to Enter the Consent Decrees lodged with

this Court on November 26, 2002.  The proposed Consent Decrees (the "Consent

Decrees," "Decrees," or "Settlements") resolves the Plaintiff's claims against 492

potentially responsible *de minimis* parties (PRPs), including 15 federal agencies,

under the Comprehensive Environmental Response, Compensation, and Liability

Act (CERCLA), 42 U.S.C. §§ 9601 - 9675.  On December 11, 2002, the United

States published notice of the proposed Consent Decree in the Federal Register

and initiated a 30-day public comment period.  67 Fed. Reg. 76191.  The

- 1 -

comment period has concluded.   Two comments were received from three parties

but, after much discussion, these comments have been withdrawn.[1]  There is no

known opposition to the entry of these Settlements.

In summary, first, the Decrees represent a substantial cost recovery for both

the United States and the Spectron PRP Site Group ("SSG") without prejudicing

either's right to pursue any non-settling PRPs.  Through the proposed settlements,

the United States will recover about $2.68 million out of the approximately $18

million in response costs that the United States Environmental Protection Agency

("EPA") has incurred and expects to incur in connection with the Site.  The SSG

will recover about $2.83 million out of the approximately $26 million in response

costs that it has incurred and expects to incur in performing the remedy at the Site.

Second,  the volumetric formula used by EPA to allocate *de minimis* liability on a

pro rata basis was reasonable and consistent with EPA policy.

The Decree is fair, reasonable, and consistent with the goals of CERCLA.

Therefore, the United States respectfully requests that this Court sign and enter

the Decrees as final judgments pursuant to Fed.R.Civ.P. 54(b).  Signature lines

---

[1]One comment was submitted on behalf of generator PRPs Ciba Specialty Chemicals
Corporation and Novartis Corporation.  Another comment was submitted by PPG Industries,
Inc., a broker PRP that delivered waste to the Site.  After much discussion among the plaintiffs
and the commentors, the commentors reached a side agreement with the SSG and Ciba Specialty
Chemicals Corporation reached an agreement with EPA to settle as a *de minimis* party under the
terms of the original offer.  As a result, both comments were withdrawn.

are provided for the Court on page 27 of both Decrees.

## I.     FACTUAL BACKGROUND

A.    Site History

The Site is approximately eight acres in size and is located just outside Elkton, Maryland in a primarily rural area. It currently is owned by Paul J. Mraz.

The Site is a former solvent recycling facility which operated from 1961 to 1988 under three corporate names: Galaxy Chemicals, Inc., Solvent Distillers, Inc., and Spectron, Inc. The principal manager of all three companies was Mr. Mraz. These companies reclaimed, reprocessed and recycled industrial wastes consisting primarily of halogenated organic solvents (e.g., methylene chloride, tetrachloroethylene, and trichloroethylene) and volatile organic aromatics (e.g., benzene, toluene, and xylene). At least one lagoon at the Site was used to dispose of process wastes generated at the facility.

When Spectron, Inc. ceased operating in August 1988, many hazardous substances that had been received, processed, generated and used in its operations were abandoned at the Site. As a result of the operating practices at the Site, contamination primarily consists of chlorinated solvents which have been detected in: groundwater seeps entering Little Elk Creek, which bisects the Site; surface water and sediments of Little Elk Creek; groundwater beneath and down

gradient of the Site; and soil. Volatile organic compounds, semi-volatile organic compounds and some heavy metals have also been detected in shallow groundwater monitoring wells at the Site. Little Elk Creek is designated by the state for the following uses: water contact recreation, protection of aquatic life and wildlife; and fishing. Site-related contaminants have been detected in residential wells located near the Site.

In April 1989, EPA conducted an emergency assessment of the conditions at the Site. EPA observed approximately 1,300 drums and 62 tanks containing hazardous substances on-site. In June 1989, the EPA Region III Regional Administrator approved the expenditure of funds pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604, to address the releases and threat of releases of hazardous substances at the Site. EPA's actions included the over-packing of drums, decanting leaking drums, sample collection and the establishment of 24-hour security.

On August 21, 1989, EPA entered into an Administrative Order by Consent (Docket No. III-89-23-DC), pursuant to Section 106 of CERCLA, with a group of PRPs). This Order required the continuation of emergency response actions for the removal and disposal of the abandoned material identified at the Site, particularly the over-packed drums and tanks at the Site. EPA concurrently

- 4 -

entered a second Administrative Order by Consent (Docket No. III-89-29-DC) with PRPs for reimbursement of response costs in the amount of $674,139.66.

On February 1, 1990, EPA issued a Unilateral Administrative Order (Docket No. III-91-11-DC) for access, pursuant to CERCLA Sections 104(e) and 106(a), 42 U.S.C. §§ 9604(e) and 9606(a), to Paul J. Mraz and Sally K. Mraz.

On October 1, 1991, EPA entered into a subsequent Administrative Order by Consent (Docket No. III-91-40-DC) with a group of PRPs to control the seepage of hazardous substances into Little Elk Creek.

On May 20, 1996 EPA entered into an Administrative Order on Consent for Remedial Investigation/Feasibility Study (RI/FS) (Docket No. III-96-15-DC), pursuant to CERCLA Sections 104 and 122, 42, U.S.C. §§ 9604 and 9622, with certain PRPs. The RI/FS, which is currently ongoing, will determine the nature and extent of contamination at the Site.

In the near future, EPA expects to issue a Record of Decision for the Site and to engage in remedial design and remedial action negotiations with the SSG, which is currently performing the RI/FS.

Based on the available information, EPA sent letters to approximately 1,000 *de minimis* parties notifying them of their potential liability at the Site and their eligibility to settle as *de minimis* parties. The letter included:  individual

settlement offers based upon each party's pro rata volumetric share of the waste at Site; and a consent decree based upon the *de minimis* model settlement agreement, which provides a release from CERCLA liability for the Site in exchange for payment of their pro rata share of the total Site costs.

About 492 potentially responsible parties (PRPs) accepted the proposed Consent Decree. On November 26, 2002, the United States simultaneously filed a complaint against these Settling *De Minimis* Parties seeking recovery of response costs under Section 107 of CERCLA, 42 U.S.C. § 9607, and lodged the proposed Consent Decrees, which, upon entry, will resolve the Settling *De Minimis* Parties' liability in this action.

B.    PROPOSED SETTLEMENTS[2]

1.    Summary

_____Pursuant to Section 122(g)(1) of CERCLA, 42 U.S.C. § 9622(g)(1), the United States "shall as promptly as possible reach a final settlement with a

---

[2]The two proposed *de minimis* consent decrees are identical except for one sentence concerning the certification required of the settling *de minimis* party (paragraph 22.a.), which was modified at the request of one *de minimis* settling defendant (Northrop Grumman, Corp.) after consulting and obtaining DOJ approval. The standard certification for *de minimis* parties provides that each *de minimis* party "certifies that to the best of its knowledge and belief, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents, or other information relating to its potential liability regarding the Site . . . ." Northrop Grumman's certification has been changed to say that it "certifies to the best of its knowledge and belief, and subject to usual and customary record retention practices in the industry, that it has not altered . . . documents[.]" (Emphasis added.)

- 6 -

potentially responsible party . . . if such settlement involves only a minor portion

of the response costs at the facility concerned and, in the judgment of [EPA], the

conditions in either of the following subparagraph (A) or (B) are met[.]"

Subparagraph (A) requires that the <u>amount</u> of hazardous substances contributed

by a generator PRP and the toxic or hazardous <u>effect</u> of those substances are

*minimal.* Subparagraph (B) pertains to owner PRPs and is not relevant for our

discussion here.

The proposed settlements are based on the "Streamlined Approach for

Settlements with *De Minimis* Waste Contributors under CERCLA Section

122(g)(1)(A)" (July 30, 1993) (attached at Tab 1) and the model *de minimis*

settlement agreement. The EPA Streamlined Approach requires payments based

on each settling *de minimis* party's contribution to the harm at the Site on a pro

rata basis, as a percentage of volume. A contractor for the SSG prepared a

volumetric ranking based upon: the testimony of Paul Mraz, the Site owner and

operator at the time of disposal; Site records; EPA's PRP investigations; and

broker records regarding waste shipments to the Site.

The volume of waste contributed to the Site by each *de minimis*-eligible

PRP was between 865 and 100,000 gallons, based on the volumetric ranking

summary ("VRS") and underlying waste-in list for the Site. The VRS identifies

the total number of gallons a *de minimis* party sent to the Site, based on the Site

transaction documents, and that party's percentage of the total Site volume.[3]  The

total volume covered by the proposed *de minimis* settlement volume is

approximately 3,358,900 gallons or 7.8 % of the total Site volume (43,230,030.5

gallons).

Approximately one thousand PRPs were offered *de minimis* settlements

based upon the VRS.  Each settling *de minimis* party's volumetric share is less

than .3% of the total waste volume.  Four hundred and ninety-eight parties agreed

to the proposed order and promised to pay their share of the total past and

expected future costs.  The settling *de minimis* parties and federal agencies are

listed with their volumetric share and payment amount in Appendices 3 and 4

attached to the Decrees.  Each party's payment amount includes a premium of

100% to cover future contingent costs of both the government and the Site Group.

The proceeds will be placed in an interest-bearing site-specific account.

Based upon the similarity of the wastes sent to the Site, the detailed and

voluminous transaction records found there, and owner Paul Mraz's testimony,

---

[3]In accordance with EPA Guidance PRPs can perform the waste-in list and volumetric ranking as long as the information and procedures used are verified for accuracy by the Agency. *See* Methodology for Early *De Minimis* Waste Contributor Settlements Under CERCLA Section 122(g)(1)(A) (June 2, 1992) at p. 4.  The PRPs performed this task comprehensively over the course of several years.  EPA verified the accuracy of the information underlying the VRS by randomly sampling transactions under the direction of a qualified statistician.

U.S. EPA-Region III has determined that the toxicity of the substances the proposed settling parties contributed to the Site is not significantly greater than the toxicity of other substances brought to the Site.  In addition, each Settling *De Minimis* Party has certified that "to the best of its knowledge, it contributed to the Site no more than 100,000 gallons of waste that may have contained hazardous substances and that the hazardous substances it contributed, if any, were of minimal toxic and hazardous effect in comparison to the other hazardous substances at the Site."   Consent Decrees, Par. 22.a, at p. 16.  These certifications are consistent with the statute, 42 U.S.C. § 9622(g)(1)(A), and with the Agency's Streamlined Approach, at 3, which provides that the "toxicity finding is met when the substances are not 'significantly more toxic and not of significantly greater hazardous effect' than other hazardous substances at the facility".  The guidance states further: "if the hazardous substances at a site are of similar toxicity and hazardous nature, a Region does not have to engage in further evaluation to make the toxicity determination."

The Site has been thoroughly investigated, and each settling party has certified, by executing the Consent Decree, that any wastes it contributed were of minimal hazardous effect compared to the other hazardous substances at the Site. *See* Consent Decrees, Par. 22.a.

2.    Settlement Provisions

Under the terms of the Consent Decrees, each settling *de minimis* party will pay to EPA and SSG its allocated share, by volume, of response costs that have been incurred and are expected to be incurred in connection with the Site.  The total payments of the settling *de minimis* parties will be approximately $2.68 million to EPA and $2.83 million to the SSG.  The payment to EPA and the SSG includes each party's proportional share of:  (1) EPA's past ($1,108,922) and estimated future ($16,880,301) costs, including all anticipated remedial work because the SSG has not yet signed a consent decree to perform this work, and (2) the SSG's past ($9,259,919) and estimated future costs ($16,878,162), including all of the work that the SSG has been obligated to perform since March 31, 2000, under the various removal and RI/FS order; plus a 100% premium on the each party's share of EPA's and the SSG's estimated future costs.[4]  These amounts include federal agency payments of $49,680.06 to cover EPA's costs and

---

[4]In a letter dated September 6, 2002, EPA-Region III notified the settling *de minimis* parties that EPA's estimate of its future costs had been revised downward to $15,506,477, about $1.4 million less than originally projected, because of the likelihood that the Agency would adopt less costly in-situ technology for the treatment of shallow soils.  Nevertheless, EPA did not adjust settlement payments for the settling *de minimis* parties because the final remedy and actual cost remain uncertain and the original estimate still falls well within the margin of error of -30% to +50% for the new future cost estimate, as described in *A Guide to Developing and Documenting Cost Estimates During the Feasibility Study*, OSWER 9355.0-75 (July 2000).  Based upon the new estimate the actual future cost is expected to fall between $10,854,534 and $23,259,716.  EPA invited any settling *de minimis* party that was dissatisfied with the Agency's determination to withdraw from the settlement by giving written notice.  None of the settling *de minimis* parties has done so.

$61,445.62 to cover the SSG's costs, for a total of $111,125.68.

Under the terms of the Consent Decrees, each settling *de minimis* party will pay to EPA and SSG its allocated share, by volume, of response costs that have been incurred and are expected to be incurred in connection with the Site.  The total payments of the settling *de minimis* parties will be approximately $2.68 million to EPA and $2.83 million to the SSG.  The payment to EPA and the SSG includes each party's proportional share of:  (1) EPA's past ($1,108,922) and estimated future ($16,880,301) costs, including all anticipated remedial work because the SSG has not yet signed a consent decree to perform this work, and (2) the SSG's past ($9,259,919) and estimated future costs ($16,878,162), including all of the work that the SSG has been obligated to perform since March 31, 2000, under the various removal and RI/FS orders, plus a 100% premium on the each party's share of the estimated future costs.[5]  These amounts include federal agency payments of $49,680.06 to cover EPA's costs and $61,445.62 to cover the

_____

[5]In a letter dated September 6, 2002, EPA-Region III notified the settling *de minimis* parties that EPA's estimate of its future costs had been revised downward to $15,506,477, about $1.4 million less than originally projected, because of the likelihood that the Agency would adopt less costly in-situ technology for the treatment of shallow soils.  Nevertheless, EPA did not adjust settlement payments for the settling *de minimis* parties because the final remedy and actual cost remain uncertain and the original estimate still falls well within the margin of error of -30% to +50% for the new future cost estimate, as described in *A Guide to Developing and Documenting Cost Estimates During the Feasibility Study*, OSWER 9355.0-75 (July 2000).  Based upon the new estimate the actual future cost is expected to fall between $10,854,534 and $23,259,716.  EPA invited any settling *de minimis* party that was dissatisfied with the Agency's determination to withdraw from the settlement by giving written notice.  None of the settling *de minimis* parties has done so.

SSG's costs, for a total of $111,125.68.

The amount paid to EPA will be deposited into a special account for the Site, for use to conduct or finance response actions at the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, at EPA's discretion. The proceeds paid to the Spectron Site Group are to be used to reduce their outstanding claims for past and future response costs relating to the Site. The United States (on behalf of the Settling *De Minimis* Federal Agencies) and SSG each specifically reserve their rights to seek relief for natural resource damage claims and state claims, neither of which are presently calculated, and other standard reservations. With the exception of the reservation of rights, there are no reopeners in the consent decree.

The settlement also secures from each settling *de minimis* party: (1) certification that the settling party has not altered or disposed of records relating to its potential liability at the Site, and that it contributed no more than 100,000 gallons of waste that contained hazardous substances to the Site, which were of minimal toxicity and hazardous effect compared to other hazardous substances at the Site (Paragraph 22.a.); (2) the promise not to assert any claim against the Superfund or bring any other claim relating to the Site against the United States; (3) the promise not to bring claims relating to the Site against any other settling

*de minimis* party at the Site; and (4) the promise not to bring claims with respect
to response actions at the Site against the SSG.

C.   Public Comments and the United States' Response

On December 11, 2002, notice of the Consent Decree was published in the
Federal Register, 67 Fed. Reg. 76191,  marking the beginning of the 30-day
period for public comment on the proposed Consent Decrees.  At the conclusion
of this 30-day period, the United States received only two comments.   As noted
above, see footnote 1, these comments have been withdrawn.

## II.   STATUTORY FRAMEWORK

A.   Congress's Intent in Enacting CERCLA

Congress enacted CERCLA in 1980 in response to widespread concern
over the environmental and public health effects created by improper disposal of
hazardous substances.  See Eagle-Picher Indus. v. EPA, 759 F.2d 922, 925 (D.C.
Cir. 1985).  By enacting CERCLA, Congress directed the President to administer
a federal program to secure "prompt and effective response to the problems of
national magnitude resulting from hazardous waste disposal." United States v.
Cannons Eng'g Corp., 899 F.2d 79, 90 (1st Cir. 1990) (quoting United States v.
Reilly Tar & Chem. Corp., 546 F. Supp. 1100, 1112 (D. Minn. 1982)).

B.   CERCLA Statutory Scheme

As amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986), CERCLA provides the Federal Government and the States with broad authority to investigate and clean up hazardous waste sites, Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), and to obtain reimbursement from PRPs of costs incurred by the Government, Section 107 of CERCLA, 42 U.S.C. § 9607.

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides inter alia that any person who arranges for another party to transport, treat, or dispose of hazardous substances owned or possessed by that person shall be liable for the removal costs incurred by the United States in cleaning up the hazardous substances.[6]   Furthermore, CERCLA creates strict, joint and several liability for responsible parties.[7]   As discussed above, joint and several liability under Section 107 of CERCLA, 42 U.S.C. § 9607, is tempered by the provision for expeditious settlements with *de minimis* parties in Section 122(g)(1)(A) of CERCLA, 42 U.S.C. § 9622(g)(1)(A).

_____

[6]   See O'Neil v. Picillo, 883 F.2d 176, 178-179 (1st Cir. 1989), cert. denied, sub nom. American Cyanamid Co. v. O'Neil, 493 U.S. 1071 (1990); New York v. Shore Realty Corp., 759 F.2d 1032, 1043 (2d Cir. 1985).

[7]   O'Neil v. Picillo, 682 F. Supp. 706, 708 (D.R.I. 1988), aff'd.,883 F.2d at 178-179; United States v. Kayser-Roth Corp., 724 F. Supp. 15, 19 (D.R.I. 1989), aff'd., 910 F.2d 24 (1st Cir. 1990), cert. denied, 498 U.S. 1084 (1991); United States v. Davis, 882 F. Supp. 1217, 1219 (D.R.I. 1995).

CERCLA and a Department of Justice regulation provide a specific mechanism for the public to review proposed environmental settlements and make their views known. *See* 42 U.S.C. § 9622 and 28 C.F.R. § 50.7. Pursuant to these provisions, the United States solicits and considers public comments for 30 days to determine whether to proceed with, or withdraw from, a settlement. Courts have upheld the sufficiency of the comment process to protect the interests of the public.[8]

III.    <u>STANDARD OF REVIEW</u>

Approval of a consent decree is a judicial act committed to the informed discretion of the trial court.[9] Generally, when reviewing a settlement the standard to be applied is whether the settlement is "fair, adequate, and reasonable." <u>Walsh v. Great Atlantic & Pacific Tea Co.</u>, 726 F.2d 956, 965 (3rd Cir. 1983). <u>See also Conservation Law Found. of New England, Inc. v. Franklin</u>, 989 F.2d 54, 58 (1st Cir. 1993)(court reviews decree to ensure that it is "fair, adequate, reasonable; that the proposed decree will not violate the Constitution, a statute, or other authority; [and] that it is consistent with the objectives of Congress")(quoting

---

[8] <u>United States v. Pitney Bowes, Inc.</u>, 25 F.3d 66, 73 (2d Cir. 1994); <u>City of Bloomington v. Westinghouse Elec. Corp.</u>, 824 F.2d 531, 537 (7th Cir. 1987).

[9] <u>United States v. Hooker Chem. & Plastics Corp.</u>, 776 F.2d 410, 411 (2nd Cir. 1985).

<u>Durrett v. Housing Authority of City of Providence</u>, 896 F.2d 600, 604 (1st Cir. 1990)).   This standard has been affirmed for the review of CERCLA settlements.[10]

Judicial review of a settlement negotiated by the United States is subject to the deference owed to "EPA's expertise and to the law's policy of encouraging settlement[.]"  <u>United States v. SEPTA</u>, 235 F.3d 817, 822 (3d Cir. 2000). Indeed, the First Circuit has stated:  "The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute."  <u>Cannons</u>, 899 F.2d at 84; <u>see also</u> <u>United States v. Rohm & Haas Co.</u>, 721 F. Supp. 666, 685 (D.N.J. 1989) ("If a settlement were required to meet some judicially imposed platonic ideal, then, of course, the settlement would constitute not a compromise by the parties but judicial fiat.  Respect for litigants, especially the United States, requires the court to play a much more constrained role.")  Furthermore, the reviewing court may approve or reject the proposed Consent Decree, but the court does not have the

---

[10]  <u>See</u>, <u>e.g.</u>, <u>Cannons</u>, 899 F.2d at 85 (court should enter a CERCLA consent decree if the decree "is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve")(quoting the House Report on the Superfund Amendments and Reauthorization Act of 1986, H.R. Rep. No. 99-253, Part 3 at 19 (1985), <u>reprinted in</u> 1986 U.S.C.C.A.N. 3038, 3042); <u>United States v. DiBiase</u>, 45 F.3d 541, 543 (1st Cir. 1995); <u>United States v. Charles George Trucking, Inc.</u>, 34 F.3d 1081, 1085 (1st Cir. 1994).

authority to modify the proposed Decree.   United States v. Cannons Eng'g Corp., 720 F.Supp. at 1036.

Accordingly, the role of the Court in this process is limited, and the Court should not substitute its judgment for that of the parties.  Because the Settlements are fair, reasonable, consistent with the goals of CERCLA , including the statute's mandate of expedited *de minimis* settlements, and in the public interest,  the Court should enter the Consent Decree.

## IV.   ARGUMENT

### The Consent Decree Should Be Approved By the Court.

As discussed below, the Consent Decree meets the standard of fairness, reasonableness, and consistency with CERCLA, and should be entered by this Court.

A.   The Consent Decree is Fair.

Fairness of a CERCLA settlement involves both procedural fairness and substantive fairness.  United States v. Davis, 261 F.3d at 23; Cannons, 720 F. Supp. at 1039.

Courts evaluate procedural fairness by considering the openness and candor of the bargaining process.  Davis, 261 F.3d at 23, *quoting,* Cannons, 899 F.2d at 86.  In Rohm & Haas, the court found that

> where a settlement is the product of informed, arms-length bargaining
> by the EPA, an agency with the technical expertise and the statutory
> mandate to enforce the nation's environmental protection laws, in
> conjunction with the Department of Justice . . . a presumption of
> validity attaches to that agreement.

721 F. Supp. at 681 (citing City of New York v. Exxon Corp., 697 F. Supp. 677,

692 (S.D.N.Y. 1988))(emphasis added); DiBiase, 45 F.3d at 544-46; Charles

George, 34 F.3d at 1089.

Here, the Consent Decree is procedurally fair.  During the course of the

settlement process, the plaintiffs and the settling de minimis defendants had

adverse interests, and many of the defendants were represented by experienced

counsel.

The second element of the fairness inquiry is substantive fairness.  As the

First Circuit stated in Cannons:  "Substantive fairness introduces into the equation

concepts of corrective justice and accountability:  a party should bear the cost of

the harm for which it is legally responsible."  899 F.2d at 87.  As the court

explained,  "The logic behind these concepts dictates that settlement terms must be

based upon, and roughly correlated with, some acceptable measure of comparative

fault, apportioning liability among the settling parties according to rational (if

necessarily imprecise) estimates of how much harm each [potentially responsible

- 18 -

party] has done." Id. at 87.[11]  Furthermore, "[a] finding of procedural fairness may

also be an acceptable proxy for substantive fairness, when other circumstantial

indicia of fairness are present." Davis 261 F.3d at 23.

In this case, the settlement follows EPA's "Streamlined Approach for

Settlements with *De Minimis* Waste Contributers under CERCLA Section

122(g)(1)(A)" (July 30, 1993).  Instead of settling on a strict, joint and several

basis, as provided by Section 107(a) of CERCLA, 42 U.S.C. § 9607, each settling

*de minimis* party will pay its allocated, pro rata "fair share," as established by the

formula:  payment amount = (individual waste volume X total costs ) / total waste

volume.  Thus, the *de minimis* parties have been afforded the opportunity to

resolve their liability under CERCLA by making a one-time cash payment

without litigation and with minimal transaction costs, thereby conserving the

resources of all parties.  The settlements represent a substantial recovery for both

the United States and the SSG while avoiding the costs of protracted litigation

against hundreds of smaller waste contributors.

B.  The Settlement Is Reasonable

Three elements are significant to the determination that a CERCLA

---

[11] See also United States v. Charles George, 34 F.3d at 1087-89.

settlement is reasonable:  "the effectiveness of the decree as a vehicle for cleaning
the environment; providing satisfactory public compensation for actual (and
anticipated) costs of remediation; and accounting for the relative strength of the
parties' litigating positions and foreseeable risks of loss."  <u>Davis</u>, 261 F.3d at 26;
<u>Cannons</u>, 899 F.2d at 89-90.

Here, both EPA and the SSG are partially reimbursed for past and
anticipated future response actions necessary to clean up the Site.  Obviously, the
contributions of the settling *de minimis* parties will help achieve remediation of
the harm at the Site.

The second factor in evaluating reasonableness, whether the public is
adequately compensated, is easily satisfied by the Settlements.  Total site costs are
expected to total about $44 million.  Under CERCLA, <u>each</u> PRP is potentially
jointly and severally liable for the entire amount of the removal costs.   However,
it is well-settled that "[d]iscounts on maximum potential liability as an incentive to
settle are considered fair and reasonable under Congress's [CERCLA] statutory
scheme." <u>Davis</u>, 261 F.3d at 26.  This is particularly true where the settling parties
contributed *de minimis* amounts of waste containing hazardous substances to the
harm at the Site.  Upon entry of the Decree, the Settling *De Minimis* Parties will

- 20 -

collectively pay over $5.4 million in CERCLA response costs.   In the future, the United States expects to recoup EPA's remaining unreimbursed costs from the major PRPs who contributed the largest volumes of waste to the harm at the Site.

The final component of reasonableness is an evaluation of the relative strength of the parties' litigating positions. [12]   A review of this element reinforces the reasonableness of the Decree.  If forced to litigate the liability issues resolved in the Decree, the United States believes it would prevail.  Nonetheless, bringing an action against so many defendants certainly would have greatly delayed the recovery of EPA's removal costs and would have forced the Government to incur significant enforcement costs in the process.  When compared to the relatively small percentage of fault attributable to the each Settling *De Minimis* Defendant, such time and expense would not have been justified.

Accordingly, the proposed Consent Decree is clearly reasonable.  The comprehensive and  expeditious recovery of costs adequately compensates the public, and the Settlements reflect the relative strengths of the parties' litigation

---

[12]   See Davis, 261 F.3d at 26 ("It is appropriate 'to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified.'") (quoting Charles George, 34 F.3d at 1087);   In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1036 (D. Mass. 1989) ("An interpretation of [CERCLA] more in keeping with the intent of, as well as the language employed by, Congress is one that requires the United States to assess the strengths and weaknesses of its case and drive the hardest bargain that it can.").

positions.

C.    The Settlements Are Consistent With CERCLA's Goals

The overarching goals of CERCLA include accountability, desirability of an

unsullied environment, and prompt response activities.  Davis, 261 F.3d at 26;

United States v. Charles George, 34 F. 3d at 1086.  Other important purposes of

CERCLA are to promote finality and reduce transaction costs,[13] which is

consistent with the general public policy favoring settlements to reduce costs to

litigants and burdens on the courts.[14]

The Decree enables expeditious and substantial recovery of the costs the

EPA and the SSG have incurred and expect to incur in abating the threat to human

health and the environment created by the hazardous substances stored at the Site.

By resolving the claims against the Settling De Minimis Defendants, the United

States and the SSG utilized the most cost-effective means of recouping a portion

of the costs of the clean up while holding hundreds of individual PRPs

_____

[13]  See 42 U.S.C. § 9622(a); Cannons, 899 F.2d at 90; United States v. Hooker Chem., 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982), aff'd, 749 F.2d 968 (2[d] Cir. 1984); United States v. Rohm & Haas, 721 F. Supp. at 696.

[14]  See, e.g., Weinberger v. Kendrick, 698 F.2d 61, 73 (2[d] Cir. 1982).  This policy is particularly strong in CERCLA cases.  See Davis, 261 F.3d at 27 ("Additionally, there is a 'strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts.'")(quoting Comunidades Unidas, 204 F.3d at 280).

accountable for the wastes they sent to the Site.

D.  The Settlement Is In the Public Interest

_____There is a "clear policy in favor of encouraging settlements . . . particularly in an area where voluntary compliance by the parties . . . will contribute significantly toward ultimate achievement of statutory goals." [15] Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767, 771 (2d Cir. 1975), cert. denied, sub nom. Larkin v. Patterson, 427 U.S. 911 (1976).   This public policy favoring the resolution of litigation by settlement is particularly strong in environmental cases.  See In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1029 (D. Mass. 1989) ("[The] Congressional purpose is better served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation.").  The policy of CERCLA is to encourage settlements, especially where the government "has pulled the laboring oar in constructing the proposed settlement." Cannons, 899 F.2d at 84.

Furthermore, the settlement of environmental cases is in the public interest

---

[15] City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988).

because it effectuates basic policy goals of the statutes. As stated above, in this case, the Government will obtain reimbursement of clean up costs associated with the Site while being spared significant litigation and enforcement costs. Meanwhile, PRPs whose wastes contributed minimally to the contamination of the Site are held accountable under the Decree but their liability has been resolved with minimal transaction costs.

## CONCLUSION

For the forgoing reasons, the United States respectfully requests that this Court approve, sign, and enter the proposed Consent Decree. Under the terms of the Decrees, "[t]he Settling De Minimis Parties and the SSG consent to approval and entry of [the] Consent Decree[s] without further notice." See Consent Decrees at 25, Paragraph 39. Therefore, the Court may proceed directly at its discretion. Signature lines have been provided for the Court at page 27 of both Decrees.

Respectfully Submitted,

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources
Division

W. BENJAMIN FISHEROW
Deputy Section Chief

Environmental Enforcement Section
Environment and Natural Resources
Division

_____/s/_____
ELLIOT M. ROCKLER
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
Division
U.S. Department of Justice
Benjamin Franklin Station
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-2653 (phone)
(202) 616-6583 (fax)
elliot.rockler@usdoj.gov

THOMAS M. DiBIAGIO
United States Attorney
District of Maryland

_____/s/_____
P. MICHAEL CUNNINGHAM
Assistant United States Attorney
101 West Lombard Street
Baltimore, MD 21201
(410) 209-4800 (phone)

Of Counsel:
HUMANE ZIA
U.S. Environmental Protection Agency
Region III
1650 Arch Street
Philadelphia, PA 19103-2029